IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL BANAKUS, individually and on behalf of all others similarly situated | ) ) ) ) | |
| Plaintiff, | ) ) | 12 C 6244 |
| v. | ) ) | Judge John Z. Lee |
| UNITED CONTINENTAL HOLDINGS, INC. and UNITED AIRLINES, INC., | ) ) ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| HOLLY HAMMARQUIST, RICH FINEMAN, BRIAN NORTON, and MICHAEL KISEL, individually and behalf of all others similarly situated | ) ) ) ) ) | |
| Plaintiff, | ) ) | 13 C 1509 |
| v. | ) ) | Judge John Z. Lee |
| UNITED CONTINENTAL HOLDINGS, INC. and UNITED AIRLINES, INC., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Daniel Banakas, Holly Hammarquist, Rich Fineman, Brian Norton, and Michael Kisel ("Plaintiffs"), on behalf of themselves and others similarly situated, filed a Complaint against United Continental Holdings, Inc. and United Airlines ("United") alleging breach of contract. The complaint alleges United breached its contract with Plaintiffs in 2011 when it modified the frequent flier benefits available to them in 2012. United now moves for

summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants United's motion.

## Factual Background[1]

A.  **United's MileagePlus Program**

Plaintiffs are a group of individuals who reside throughout the United States; they are all members of United's frequent flier program called MileagePlus. Defs.' LR 56.1(a)(3) Stmt. ¶¶ 1–5, 8, 10. Enrollment in this program is free. *Id.* ¶ 9. Once enrolled, members receive benefits for accumulating mileage credit by traveling on United flights, using a United credit card, or renting cars from companies that have partnered with United. *Id.*

The MileagePlus program contains several enhanced status levels that offer additional benefits. *Id.* ¶ 11. All Plaintiffs qualified for these additional benefits in 2011. Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 23. United currently refers to these status levels as "Premier status levels."[2] Defs.' LR 56.1(a)(3) Stmt. ¶ 12. Only members of MileagePlus can qualify for the Premier levels. *Id.* ¶ 13.

In 2011, United had three Premier levels: Premier, Premier Executive, and Premier Executive 1K. *Id.* ¶ 18. The benefits at each level included all benefits provided at the immediately preceding level, plus additional benefits. *Id.* ¶ 20. United provided these benefits on an annual basis in a given calendar year based upon the status level the MileagePlus member achieved in the immediately preceding year. *Id.* ¶ 21. MileagePlus members who qualify for one of the Premier status levels during a certain year also received the corresponding benefits for the remainder of that qualifying year. *Id.* ¶ 22.

---

[1] All facts are undisputed, unless otherwise indicated.

[2] Prior to 2012, the company used both the terms "Premier" and "Elite" to refer to these levels. Defs.' LR 56.1(a)(3) Stmt. ¶ 12.

**B.      The Terms of the Contract and United's Website**

Every customer who enrolls in MileagePlus agrees to be bound by the MileagePlus Program Rules ("Program Rules"). *Id.* ¶ 28. The Program Rules state that participation in MileagePlus is governed by those rules and, in 2011, provided that "United has the sole right to interpret and apply the Program Rules." *Id.* ¶¶ 29, 31. General Condition No. 1 of the 2011 Program Rules stated that "United has the right . . . to change the Program Rules, regulations, benefits, conditions of participation or mileage levels, in whole or in part, at any time, with or without notice, even though changes may affect the value of the mileage or certificates already accumulated." *Id.* ¶ 36, Ex. 1-C.

Additional information regarding Premier or Elite level benefits could be found on the United website in 2011 on a page bearing the heading "Elite benefits and more." Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 12, Ex. C. This particular webpage contained a section "Member benefits by status level." *Id.* ¶ 16, Ex. C. Here, United listed the benefits associated with each status level, which at the time included complimentary Economy Plus seating and two free checked bags for Premier members, 100% mileage bonuses for Premier Executive members, and other upgrades and benefits for all three Premier status levels. *Id.* After the end of the column listing the benefits associated with Premier status, United provided a link titled "Learn more." *Id.* That link led to another webpage, which provided that "[u]nless otherwise stated, the terms and conditions set forth in Mileage Plus Program Rules are applicable to the Premier program." Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 57, Ex. F. A few lines down, the webpage also read, "Program benefits and qualifications are subject to change from year to year." *Id.* Also on that page, the website

3

stated that "[t]he benefits for 2011 elite status presented here are for members who qualified in the 2010 calendar year or during 2011." *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 26, Exs. 14-A to 14-F.

C.   **United's Program Modifications**

Following the merger between United and Continental Airlines, United announced on June 29, 2011, that MileagePlus would be the single loyalty program for the merged airlines starting in 2012. *Id.* ¶ 53. On September 21, 2011, United provided more information about the 2012 changes. *Id.* ¶ 55. The three Premier levels were given new names, and a fourth level added. *Id.* ¶ 56. United explained the changes would "take effect late in the first quarter of 2012." *Id.* ¶ 59. Along these lines, United made changes to the Premier benefits provided in 2012 to those who qualified in 2011. *Id.* ¶ 62. For example, those customers in the 2011 program at the 25,000 status level were entitled to two free checked bags on every United flight and could select Economy Plus seats at no additional charge when they booked their flight; after the 2012 changes, members at this status level were only entitled to one free checked bag and had to wait until check-in to select Economy Plus seats at no charge. *Id.* ¶ 63. Plaintiffs now contend that these changes constituted a breach of contract by United.

**Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts[,]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986), and instead "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). The Court will, however, "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statements." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).

## Analysis

This case involves a breach of contract, and, of course, a contract must exist between the parties before one side can be said to have breached it. *Zirp–Burnham, LLC v. E. Terrell Assocs., Inc.*, 826 N.E.2d 430, 439 (Ill. App. Ct. 2005). Here, the parties agree that at least one contract governed the relationship between the Plaintiffs and United: the Program Rules. The parties dispute, however, whether the Plaintiffs have created a genuine issue of material fact as to the existence of two additional agreements that applied specifically to Premier members: one that entitled customers, who achieved Premier status in 2011, to the same benefits offered in 2011 in 2012; and another that exempted Premier members from General Condition No. 1. Indeed, without these separate agreements for Premier members, Plaintiffs' breach of contract claim quickly fails because General Condition No. 1 of the Program Rules permitted United to modify benefits "in whole or in part, at any time, with or without notice." Defs.' LR 56.1(a)(3) Stmt. ¶ 36, Ex. 1-C. And, in the Seventh Circuit, United's changes to Plaintiffs' 2012 benefits would be permissible under this provision. *See Lagen v. United Cont'l Holdings, Inc.*, 774 F.3d 1124, 1127 (7th Cir. 2014) ("Since the MileagePlus Program Rules plainly allow United to reduce benefits on a whim, [plaintiff] could not prevail").

Plaintiffs are not the first to allege the existence of a contract separate from the Program Rules. In *Lagen*, the plaintiff was a United customer who had earned "Million-Mile Flyer

5

status" with the airline in 2006. *Id.* at 1126. The Million-Mile Flyer status—awarded to MileagePlus members who had flown over one million paid flight miles—afforded "the benefits and privileges of Premier Executive status for life." *Id.* But after its merger with Continental, United, as it did with the Plaintiffs in this case, reduced the benefits associated with the Million-Mile Flyer status. *Id.*

To support his assertion of a separate contract, the plaintiff in *Lagen* argued the fact that "the MileagePlus Program Rules do not expressly mention Million-Mile Flyers . . . demonstrates that Million-Mile Flyer benefits are not part of MileagePlus." *Id.* at 1127. United responded by pointing to three pieces of evidence to establish that the Million-Mile status fell under MileagePlus rules. First, United advertised the Million-Mile status as a "reward" for its "MileagePlus members." *Id.* Second, the United website placed information about Million-Mile benefits under the "umbrella of MileagePlus." *Id.* Finally, a member's Million-Mile status "is noted on her MileagePlus member card." *Id.* After reviewing the record, the Seventh Circuit determined that the plaintiff had "not submitted any evidence that would support a conclusion that Million-Mile Flyer benefits are separate from MileagePlus." *Id.*

Like the Million-Mile Flyer status in *Lagen*, Premier is a status level of the MileagePlus Program that is "under the umbrella of MileagePlus." Furthermore, qualifying members receive MileagePlus membership cards denoting their Premier status. *Id.*; *see* Defs.' LR 56.1(a)(3) Stmt. ¶ 14; Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 12, Ex. C. Accordingly, without more, Plaintiffs' arguments would suffer the same fate as those presented in *Lagen*.

Attempting to circumvent *Lagen*, Plaintiffs argue that, unlike the *Lagen* plaintiff, Plaintiffs *do* present evidence to support the existence of a separate contract in this case. First, Plaintiffs contend that various representations pulled from United's website collectively formed

6

an enforceable offer promising specific benefits in 2012 for customers who obtained Premier status in 2011. Second, Plaintiffs argue that certain statements contained on the United website render General Condition No. 1 inapplicable to Premier members.

With regard to their first contention, Plaintiffs summarize the representations making up an enforceable promise for 2012 benefits as follows:

> At the top of the page, under the heading "Why be Elite," United provided a general overview of the benefits common to each status tier. The next section is entitled "Member benefits by status level," in which United lists each Premier status level, details the specific benefits that each status level will receive and sets forth the number of qualifying miles or segments needed to qualify for each level. This section also described the qualification period for and duration of the Premier status levels, in which United explained that miles or segments "earned between January 1st and December 31st each year . . . count toward a higher status level . . . for the following calendar year."

Pls.' Resp. 11 (citations omitted). These representations are insufficient to survive summary judgment for a number of reasons.

First, Plaintiffs do not accurately represent the information contained on United's website. Specifically, the website did not list "the benefits that each status level would receive the *following* year." *Id.* Rather, the website listed the benefits provided for each membership tier in the *current* year. To illustrate, in 2011, the website plainly noted that "[t]he benefits for 2011 elite status presented here are for members who qualified in the 2010 calendar year or during 2011." *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 26, Exs. 14-A to 14-F. It is true that this information was not presented on the exact same webpage as the advertised benefits, but Plaintiffs do not argue that the location of the statement alone would render the disclaimer ineffective; in fact, Plaintiffs themselves rely upon other statements made on this same page to support their other arguments. *See infra* 8–9.

7

In an effort to minimize this sentence, Plaintiffs characterize the statement as "a single cryptic reference to '2011' benefits that was surrounded by other terms indicating that those benefits would be provided in the 'following calendar year.'" Pls.' Sur-reply 2. But the statement is anything but "cryptic," and it would be unreasonable to interpret the surrounding terms as a promise for specific benefits in 2012 in light of it.

Plaintiffs also rely on the notion that "United structured its offer in a forward-looking manner" when construing the collective representations on the 2011 website as an offer for specific benefits in 2012. Pls.' Resp 17. And, indeed, the program was "forward-looking" insofar as United advised customers that to achieve Premier *status* down the road they must first "earn a certain number elite miles (EQM) or elite status segments (EQS) between Jan. 1 and Dec. 31." Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 14, Ex. D. But the website did not promise any future *benefits* associated with that status. Instead, United listed the *current* benefits associated with the program, while simultaneously—albeit elsewhere—reserving the right to change those benefits. These statements do not, as Plaintiffs contend, constitute an offer for a unilateral contract, which must be "'so definite in its terms . . . that the promises and performances to be rendered by each party are reasonably certain.'" *Jones v. Eagle II*, 424 N.E.2d 1253, 1258 (1981) (quoting 12 Ill. L. & Prac. Contracts § 33 (1955)). Plaintiffs may have understandably hoped for the 2011 Premier benefits to continue in 2012, but these subjective expectations do not control whether the website could be objectively construed as an offer for those benefits; it is the contractual language that is of paramount importance. *See Cox v. U.S. Fitness, LLC*, 2 N.E.3d 1211, 1217–18 (Ill. App. Ct. 2013). And the language Plaintiffs submit as evidence on summary judgment does not reasonably support the conclusion that United made an offer for specific benefits in 2012.

This, however, does not end the Court's inquiry, as Plaintiffs also assert they have evidence to support a separate agreement that supplants General Condition No. 1 with a new rule for Premier members. That evidence comes in the form of two other statements that appear on United's website. The first statement provides, "[u]nless otherwise stated, the terms and conditions set forth in Mileage Plus Program Rules are applicable to the Premier program." Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 57, Ex. F. On that same page, a second statement notes that the "[p]rogram benefits and qualifications are subject to change from year to year." *Id.* According to Plaintiffs, a rule allowing United to change benefits from "year to year" is "diametrically different and inconsistent" with the rule allowing United to change benefits "at any time" contained in the Program Rules. *See* Pls.' Mem. 18. Plaintiffs argue that, in this sense, the website "otherwise state[s]" a new term for the Premier program and, therefore, these statements taken together create a genuine issue of material fact as to the existence of a separate agreement for Premier members that replaces General Condition No. 1 with the "year to year" limitation.

To advance this argument, Plaintiffs point to language providing that "[u]nless otherwise *stated*," the Program Rules apply to Premier members. But nowhere does the website "otherwise state[]" that General Condition No. 1 of the Program Rules is inapplicable to Premier members. Nor does the Court find the "year to year" language necessarily inconsistent with the language of General Condition No. 1, as Plaintiffs assert. To the contrary, as United persuasively argues, the "year to year" language "was simply 'to remind people that it's an annual program' and to 'set[] the expectation' that qualifications and benefits could be different next year from the current year," not to limit the airline's ability to change the benefits for Premier members in accordance with General Condition No. 1. Defs.' Reply 13.

9

But even assuming, *arguendo*, that the Court were to read the "year to year" provision as Plaintiffs urge, Plaintiffs have failed to show how United breached the provision in this instance. Plaintiffs interpret the "year to year" language to mean that any changes to their benefits for a certain year must be made before the start of the preceding year. Pls.' Resp. 22. For example, Plaintiffs argue that, in order to make changes to benefits for 2012, United must announce those changes no later than December 31, 2010. *Id.* According to Plaintiffs, this is because by 2011 Premier members would have already begun to "earn" their status for 2012. *See id.* at 23. But this interpretation is strained and without support. Nowhere does the language on the website impose upon United a duty to give its members at least a full year's notice for changes to their benefits. Nor are members entitled to Premier benefits as soon as they "begin" to accumulate miles toward Premier status; rather, they are entitled to the benefits only after they reach the specified mileage levels. And even the most favorable interpretation of the phrase—that United could not change the benefits in the middle of a benefit year—would still permit United to change its 2012 benefits program in 2011.

Indeed, Plaintiffs themselves admit that customers who achieved Premier status in 2011 received the benefits listed on the website for the remainder of 2011. So if those benefits applied to year 2011 *and* United can change the benefits "year to year," United would be within its rights then to change Premier status benefits for 2012 in 2011. While Plaintiffs may find this unfair or "misleading," it is not a breach of contract. *See Lagen*, 774 F.3d at 1128. Accordingly, United's motion for summary judgment is granted.

## Conclusion

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment in the *Banakus* case [95] and the *Hammarquist* case [41]. These cases are hereby terminated.

**SO ORDERED**           **ENTER:**

*/s/ John Z. Lee*

**JOHN Z. LEE**
**United States District Judge**